IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| DAE EEK CHO, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) CIVIL ACTION NO. 5:13-CV-153 (MTT) |
| UNITED STATES OF AMERICA, | ) ) ) |
| Defendant. | ) ) |

### ORDER

The Government has moved for summary judgment. (Doc. 37). The Plaintiff has also moved for summary judgment and filed several other motions. (Docs. 44; 48; 53; 55; 58; 83; 84; 94; 98; 116). The Government's motion is **GRANTED**, and the Plaintiff's motions are **DENIED**.

### I.    BACKGROUND[1]

The Plaintiff, a native and citizen of South Korea, brings several claims against the Government under the Federal Tort Claims Act ("FTCA"). (Docs. 13 at 6; 14; 38 at ¶ 2; 11-2 at 1). These claims arise from alleged misconduct by U.S. Immigration and Customs Enforcement ("ICE") employees. She claims she was falsely arrested and falsely imprisoned when she was taken into custody and detained for removal proceedings. She claims she was assaulted while being transported to the immigration court. Finally, she claims she suffered severe emotional distress based on the

---

[1] The history of this case is convoluted and will not be discussed in detail here. Most of the relevant procedural facts are discussed in the Court's Order denying the Plaintiff's two motions to disqualify, three motions to recuse, and a motion for a judge to remove himself. (Doc. 82).

conditions she was housed in during her detention and the Government's alleged refusal to provide her with medical treatment.

In response to the Government's motion for summary judgment, the Plaintiff has filed two documents purporting to address the Government's statement of material facts and two documents purporting to be her own statement of "undisputed facts."[2] (Docs. 46; 47; 113-1; 113-2). However, most, if not all, of the facts set forth by the Government in its statement of material facts (Doc. 38) "are not specifically controverted by specific citation to particular parts of materials in the record" as required by Local Rule 56 and so are deemed admitted. M.D. Ga. L.R. 56; Fed. R. Civ. P. 56(e). For example, in response to the Government's statement that the Irwin County Detention Center contracts with the federal government to house detainees for ICE, the Plaintiff responds: "The people at [Irwin County] do not even blow their noses and go to the bathroom without ICE approval and that is a fact." (Docs. 38 at ¶ 12; 47 at ¶ 12).

Many of the "facts" set forth by the Plaintiff are conclusory statements and wild accusations—such as, the Plaintiff "was kidnapped by ICE renegades," "illegally held" by an "out of control government," and "subjected to Name Calling and lies by ICE criminals." (Doc. 46 at ¶¶ 1, 6, 21). The Plaintiff does, however, attach several exhibits to her response to the Government's motion for summary judgment and her own motion for summary judgment. (Docs. 98; 113). The Government does not address most of this evidence, and so much of the Plaintiff's evidence is left unchallenged. Of course, it is not necessary to address all of the alleged factual disputes between the parties to resolve the pending motions. "Only factual disputes that are material under the

---

[2] The Court provided the Plaintiff with an opportunity to supplement her response to the Government's motion for summary judgment and informed her of the need to respond to the Government's assertions and statement of material facts by filing affidavits or other factual material. (Docs. 104; 114 at 17:9-18:6).

substantive law governing the case will preclude entry of summary judgment." *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004).

### A. False Arrest and False Imprisonment

The Plaintiff was granted a six-month tourist visa, which expired on August 10, 1999. (Docs. 38 at ¶ 2; 11-2 at 1). On August 27, 2007, immigration authorities issued a Notice to Appear before an immigration judge in proceedings seeking the Plaintiff's removal from the United States for overstaying her visa. (Docs. 38 at ¶ 3; 11-2). The Plaintiff's case was scheduled for a hearing in Honolulu, Hawaii, on December 10, 2007. (Docs. 38 at ¶ 5; 11-3). The Plaintiff failed to appear for the hearing, and an immigration judge administratively closed her case. (Docs. 38 at ¶ 6; 11-4). At some unspecified time before April 27, 2011, the Plaintiff was jailed in Gwinnett County on a shoplifting charge and for allegedly violating probation for some unspecified conviction. (Docs. 38 at ¶ 7; 39-1 at 130:7-15). As a result, the venue for the Plaintiff's removal proceedings was moved from Honolulu to Atlanta, Georgia. (Docs. 38 at ¶ 8; 11-5). An immigration hearing was scheduled for April 27, 2011, but an immigration judge administratively closed her case because she was still in jail at the time of the hearing. (Docs. 38 at ¶ 10; 11-7). The Plaintiff was transferred into ICE custody later that day, and the U.S. Department of Homeland Security moved the immigration court to "recalendar" her removal proceedings. (Docs. 38 at ¶¶ 11, 14; 11-7). The Plaintiff also moved the immigration court to "reopen" her case and set bond. (Docs. 38 at ¶ 14; 11-6).

Between May 2011 and February 2012, the Plaintiff had numerous hearings before the immigration court.[3] (Docs. 38 at ¶ 15; 11-7). An immigration judge denied the Plaintiff's request for bond, finding that her detention was mandatory pursuant to § 236(c) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1226(c).[4] (Docs. 38 at ¶ 16; 11-8). The Plaintiff hired at least four attorneys to assist her in filing a Form I-601, Application for Waiver of Grounds of Inadmissibility, for waiver of her shoplifting convictions so that she could adjust her status to a permanent resident on the basis of her marriage to a United States citizen. (Docs. 39-1 at 73:9-74:7, 78:18-79:1, 82:8-11; 38 at ¶¶ 19-30). The Plaintiff's case was continued several times, in part, because her attorneys were unprepared. (Docs. 39-1 at 75:1-9, 82:16-19; 38 at ¶ 20). On February 21, 2012, an immigration judge granted the Plaintiff's request for waiver under § 212(h) of the INA and adjusted her status under § 245 to that of a lawful permanent resident. (Docs. 38 at ¶ 31; 11-12). The Plaintiff was then released. (Doc. 39-1 at 95:12-14).

### B. Assault

The Plaintiff claims that Immigration Enforcement Agent Anthony Settle assaulted her on December 8, 2011, when he "threatened [her] with a gun." (Docs. 14 at 5; 113-6 at ¶ 6). The Plaintiff elaborates on this event in her deposition and amended complaint, which she testified was true. (Doc. 39-2 at 35:21-36:19).

---

[3] For some reason, the Government provided a much more developed record in the Plaintiff's husband's case regarding what occurred during these hearings. *See Bloodworth v. United States*, No. 5:13-cv-112, 2014 WL 1813374 (M.D. Ga.). The Plaintiff also does not meaningfully discuss the details of these hearings, notwithstanding her claim that her transfer into ICE custody and her subsequent detention pending the resolution of her immigration case makes the Government liable for false arrest and false imprisonment.

[4] As discussed in *Bloodworth*, the judge determined that the Plaintiff was ineligible to be released on bond due to her multiple convictions for shoplifting. 2014 WL 1813374, at *1; *see also id.*, ECF No. 66 at 11:21-13:19 (transcript of the hearing).

While being transported to the immigration court, the Plaintiff informed Settle that her husband would be allowed to attend the hearing. (Docs. 39-1 at 104:4-5; 39-2 at 37:1-3). She testified that Settle removed a gun from a "gun box that was on the wall" and "kind of slowly started pointing it from the ground towards the … ceiling very slowly and slowly put it in his holster." (Docs. 14 at 5; 39-1 at 104:7-10; 39-2 at 37:9-12). Or, as the Plaintiff describes elsewhere, Settle "took the gun and he slowly aimed it, lifted it to the ceiling and showed he [sic] put it in his holster." (Doc. 39-2 at 37:10-12). She further testified that Settle looked at her in a "very threatening" and "very disparaging" way. (Docs. 39-1 at 104:5-12; 39-2 at 37:12-13). Finally, she claims Settle asked her who let her husband into the courtroom in a "very condemning way." (Docs. 39-1 at 104:6-7; 39-2 at 37:7-9). The Plaintiff testified that Settle "tried to scare" her and that she "really did get scared." (Doc. 39-2 at 37:13-14). The Plaintiff says in her affidavit that she "felt as though Settle was silently saying with his attitude that 'I have power over you and with this gun and I could kill you.'" (Doc. 113-6 at ¶ 13).

As evidence of her injuries, the Plaintiff testified that she was "emotionally distraught at this incident," and once she returned to Irwin County, she "was placed in the medical facility for medical treatment and suicidal observation." (Docs. 14 at 5; 39-2 at 36:14-20). The Plaintiff also attached a letter from Roby M. Kerr, Ph.D, who says the Plaintiff "feared death during [her detention], based on cancer and the hostility of guards including her report of having had a pistol waved at her when alone with a guard."[5] (Doc. 113-3 at 1). Kerr says the Plaintiff "will require psychotherapy for the depression and to repair the PTSD symptoms created by the cumulative traumatic effects of incarceration without cancer medication and fear of death, as well as additional

---

[5] The Government raises no objection to Dr. Kerr's letter.

traumatizing impact of how she was dealt with at the Court and at [Irwin County]." (Doc. 113-3 at 3). The Government does not address the Plaintiff's alleged injuries, and as noted throughout this Order, does not object to the Plaintiff's "evidence" of her alleged injuries and the alleged treatment for those injuries.

### C. Intentional and Negligent Infliction of Emotional Distress

Finally, the Plaintiff brings claims for intentional and negligent infliction of emotional distress based on the conditions of her repeated travels to the immigration court in Atlanta and the purported decisions of ICE agents to refuse her medical treatment. (Docs. 11-13; 14).

While in ICE custody, the Plaintiff was detained at a detention center in Irwin County, Georgia. (Docs. 38 at ¶ 12; 11-15). Pursuant to an agreement with the federal government, Irwin County was responsible for the ICE detainees' transportation to and from the immigration court. (Docs. 11-15 at 6; 38 at ¶ 13). The Plaintiff says she was "physically and emotionally destroyed" by her trips to the immigration court in 2011 (April 27, May 11, May 25, June 8, July 7, September 14, October 28, December 8) and in 2012 (February 14 and February 21). (Docs. 113-6 at ¶¶ 10, 14-15). She says she was "placed on suicide watch on two different occasions." (Docs. 113-5 at ¶ 9; 113-6 at ¶ 14).

She claims all of these trips followed the same pattern as her May 11 trip, which she describes in detail. (Docs. 113-6 at ¶¶ 14-15). On that trip, the Plaintiff was placed in a holding cell at midnight and given water and a cold bologna sandwich. Two hours later, she and other detainees boarded a bus for a four hour trip to Atlanta. She received no other food or water during this bus ride. (Doc. 113-6 at ¶ 14). Once in

Atlanta, the Plaintiff was placed in a holding cell with temperatures ranging from 20 to 35 degrees.  (Docs. 113-6 at ¶ 14; 39-1 at 116:1-2).  When the Plaintiff and others asked that the holding cell be made warmer and for additional clothes, their requests were denied (even though the Plaintiff said she was a cancer patient), and they were told they "carried 'germs' that needed to be extinguished."  (Docs. 113-6 at ¶¶ 11, 14; 39-2 at 10:8-19).  The restroom in the holding cell, which the Plaintiff was forced to use, "had a[n] exposed view" despite the presence of male agents—it was "constructed in the form of an office cubicle with open space at the top and bottom"—and so "[f]emale detainees were forced to attempt to hide and or cover themselves in any manner possible in this inhuman[e] animal restroom situation."  (Docs. 113-6 at ¶¶ 12, 14; 39-1 at 116:2-3).  After the Plaintiff's court appearance (some seven hours later), she was forced to wait in the holding cell for "another four to six hours" before the bus ride back to Irwin County.  (Doc. 113-6 at ¶ 14).  The bus did not have air conditioning and so the temperature "approached 100 degrees."  (Docs. 113-6 at ¶¶ 7, 14; 39-1 at 101:10-102:13).

The Plaintiff also claims that she and her husband, Edward Lamar Bloodworth, informed ICE agents of her need for medical treatment in May 2011 but no treatment was provided until October 2011.  (Docs. 11-13; 14 at 4-5).  The Plaintiff was diagnosed with cancer in 2007.  (Doc. 39-2 at 52:8-10).  She testified that during her detention at Irwin County's detention center she "was supposed to continue to take medication per doctor's instruction" but was "denied medication (tamoxifen)" and "surveillance exams for cancer follow up."  (Docs. 39-1 at 121:8-14; 113-6 at ¶¶ 4-5).  The Plaintiff filed a letter from her doctor, Dr. Christopher Hagenstad, who says that the Plaintiff "has been

prescribed daily hormone blocking therapy, which should continue for at least ten years."[6] (Doc. 30 at 4). Dr. Hagenstad says that "regular examinations with work up of symptoms are an integral part of the surveillance plan, as is continuing therapy with daily tamoxifen." (Doc. 30 at 4). He also says that it is his "understanding that [the Plaintiff] was unable to continue tamoxifen therapy from April 2011 through February 2012" and that "[d]uring that time period, she should have been seen in our office for examination and follow up every three to six months, and was not able to keep any appointments."[7] (Doc. 30 at 4).

Prior to her detention and transfer into ICE custody, the Plaintiff was jailed in Gwinnett County for at least three months.[8] (Docs. 38 at ¶ 54; 39-1 at 62:12-15). The Plaintiff did not have her medication while she was there. (Doc. 39-1 at 62:5-19). In her deposition, the Plaintiff testified that she asked Bloodworth to bring her medication to her but "[h]e couldn't because he … had some situation where he couldn't bring it." (Doc. 39-1 at 62:20-63:1). She first said she did not remember what that situation was "but it was a very urgent situation." (Doc. 39-1 at 63:2-4). She then said that "he brought it but wasn't able to hand it to [her]," but she did not know if he tried to give it to any officials at the Gwinnett County jail. (Doc. 39-1 at 63:6-9). After being at the Gwinnett County jail for one month, the Plaintiff informed someone that she needed to take her medication. (Doc. 39-1 at 63:10-15). She then saw a doctor and told him about the medication, but the doctor refused to prescribe it to her. (Doc. 39-1 at 63:16-

---

[6] The Plaintiff testified that she was supposed to take the medication "from two to three years" after her chemotherapy and radiation therapy, which occurred in September 2009. (Doc. 39-1 at 46:7-12).

[7] Again, the Government raises no objection to Dr. Hagenstad's letter.

[8] The Plaintiff saw Dr. Hagenstad "maybe eight months … [or] a year" before she went to the Gwinnett County Detention Center. (Docs. 38 at ¶ 62; 39-2 at 55:11-18).

64:11). Although the Plaintiff complained to a "supervisor" that the doctor would not give her the medicine she needed, she never received it while at the Gwinnett County jail. (Doc. 39-1 at 64:12-65:9).

After the Plaintiff was transferred into ICE custody, Bloodworth began informing ICE that the Plaintiff needed medical treatment, which Bloodworth discusses in detail in his declaration. (Doc. 57). According to Bloodworth, he informed "ICE attorney Duncan" on May 11, 2011, that the Plaintiff needed medication and treatment as a cancer patient, and Duncan instructed him to contact "ICE case worker Nadia Arabi," who was "responsible for obtaining the [Plaintiff's] medical treatment and medication." (Doc. 57 at ¶¶ 3-4). Bloodworth went to Arabi's office, and after being instructed to call Arabi's voicemail, he left Arabi an "urgent message." (Doc. 57 at ¶¶ 5-6). Arabi did not return his call, so Bloodworth left Arabi the same message on May 12. (Doc. 57 at ¶ 7). Bloodworth then left Arabi messages on May 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, and 24. (Doc. 57 at ¶¶ 8-20). Arabi finally returned Bloodworth's calls on May 25; however, Arabi "became belligerent on the phone, was skeptical of the calls, hung up the phone and did nothing." (Doc. 57 at ¶¶ 21-22). "Noting Arabi's incompetency," Bloodworth contacted "ICE supervisor Dan Jones" to notify him of the Plaintiff's need for medical treatment and Arabi's inaction. (Doc. 57 at ¶ 23). Jones likewise did not believe Bloodworth and did nothing, but Jones eventually sent Bloodworth's complaints to "ICE Director Skinner." (Doc. 57 at ¶¶ 24-27). Jones later informed Bloodworth that Skinner had denied his requests. (Doc. 57 at ¶ 32).

At some point in October 2011, the Plaintiff received "long past due medical treatment." (Doc. 14 at 5). The Plaintiff met with a psychologist and a "major" or

"specialist" doctor at Irwin County's detention center and received her medication. (Docs. 38 at ¶ 58; 39-1 at 66:2-16). She was also checked for cancer and received a CAT scan at an outside facility. (Docs. 38 at ¶ 59; 39-1 at 50:6-7, 67:9-15). In her deposition, the Plaintiff twice testified that the last time she took her medication was when she was detained at Irwin County, but she also testified that she took the medication for three to four months after she was released. (Doc. 39-1 at 45:17-46:1, 48:4-6, 109:11-16).

The Government claims that Irwin County, not ICE or the federal government, was responsible for the Plaintiff's medical care. (Doc. 38 at ¶¶ 12-13). The Government has attached the "Intergovernmental Agreement" between the federal government and Irwin County. (Doc. 11-15). This agreement provides that Irwin County "shall provide the full range of medical care required within the facility including dental care, mental health care, pharmaceuticals, and record keeping." (Doc. 11-15 at 4). It further provides that Irwin County "will submit to the Federal Government requests for approval of all treatment to be provided outside the facility" and that the "Federal Government shall be responsible for the cost of approved outside medical treatment." (Doc. 11-15 at 4).

The Plaintiff responds that "ICE controls, determines and approves medical treatment for detainees" and that "[Irwin County] requires ICE approval in writing from Atlanta before medical treatment is ordered or delivered." (Doc. 113-2 at ¶ 16). In support, the Plaintiff has attached an affidavit of Bonnie Youn, one of the Plaintiff's attorneys during her immigration case. (Doc. 113-4). Youn testifies that "[a]s part of [her] preparation to assist [the Plaintiff], [she] requested medical records from Irwin

County Detention Center."  (Doc. 113-4 at ¶ 6).  Youn also wanted a private psychologist to visit and examine the Plaintiff.  (Doc. 113-4 at ¶ 7).  According to Youn,

> When I inquired about procedures to obtain medical records and allow a visit by a psychologist, I was told by ICE and Irwin County that I would have to get prior approval from ICE supervisor in Atlanta, Timothy Klees.  I was also told the medical records would not be available and no psychologist would be allowed without prior approval from ICE in writing.

(Doc. 113-4 at ¶ 8).  Youn testifies that this ICE policy "determines the type of treatment that is allowable for detainees in Irwin County and also determines what medical practitioners are allowed to visit detainees and the frequency of any such visits."  (Doc. 113-4 at ¶ 10).  Youn says she encountered the same procedures at a detention center in Etowah, Alabama, leading her to conclude that this ICE policy is wide spread.[9]  (Doc. 113-4 at ¶¶ 8-9).  The Plaintiff has also attached what appears to be Youn's written request to ICE, in which Youn describes speaking to Irwin County and ICE officials and being "informed that [she] had to make this request in writing to ICE in Atlanta."  (Doc. 98 at 14).

Finally, the Plaintiff testified that she was "very severely neglected" by Arabi, who was supposed to see the Plaintiff "at least once a week" but would only "come at best every three weeks."  (Docs. 39-1 at 116:25-117:16; 39-2 at 19:7-18, 39:15-18).  When Arabi did come, "she wouldn't give [the Plaintiff] a chance to talk" and would stay "maybe one or two minutes."  (Doc. 39-1 at 117:4-6).  The Plaintiff also attempted to "hold" Arabi in order to speak with her, but Arabi claimed that the Plaintiff assaulted her and so the Plaintiff was put in isolation.  (Docs. 39-1 at 117:6-9; 39-2 at 19:22-20:1).  The Plaintiff also says that Arabi and "another case manager named Jones" falsely told her that she could "ask for voluntary departure from the U.S. and return in three

---

[9] Again, the Government raises no objection to Youn's opinion testimony.

months." (Docs. 14 at 5; 39-2 at 43:14-44:25). This led the Plaintiff to feel "confused[,] disoriented[,] and distressed" because she believed this "and was telling others in the facility of the false news only to be humiliated and ridiculed by others in the facility for believing the agents['] lies." (Docs. 14 at 5; 39-2 at 44:2-25).

The Plaintiff had a cancer recurrence after filing this lawsuit, and both she and Bloodworth say it was caused by the actions of the Government's employees.[10] (Docs. 113-5 at ¶ 14; 113-6 at ¶ 17; 39-2 at 58:22-24).

## II. DISCUSSION

### A. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)). The burden rests with the moving party to prove that no genuine issue of material fact exists. *Id.* The party may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

"If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary judgment." *Anthony v. Anthony*, 642 F. Supp. 2d 1366, 1371 (S.D. Fla. 2009) (citing

---

[10] The Government does not object or respond.

*Four Parcels of Real Prop.*, 941 F.2d at 1438). The moving party must carry its burden by presenting "credible evidence" affirmatively showing that, "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." *Four Parcels of Real Prop.*, 941 F.2d at 1438. In other words, the moving party's evidence must be so credible that, if not controverted at trial, the party would be entitled to a directed verdict. *Id.*

"If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" *Id.* (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991)) (alteration in original). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. ... The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Thus, the Court "'can only grant summary judgment if everything in the record demonstrates that no genuine issue of material fact exists.'" *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 940, 952 (11th Cir. 1986)).

In contrast, "[w]hen the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437 (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)). The moving party "simply may show … that there is an absence of evidence to support the nonmoving party's case."

*Id.* at 1438 (internal quotation marks and citation omitted). "Assuming the moving party has met its burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial." *Info. Sys. & Networks Corp.*, 281 F.3d at 1224-25 (citing *Celotex Corp.*, 477 U.S. at 324).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (internal quotation marks and citation omitted). The Court will consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *See Am. Bankers Ins. Grp.*, 408 F.3d at 1331.

**B. Analysis**

The FTCA provides a limited waiver of the United States' sovereign immunity "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). The FTCA permits claims against the United States "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Id.* The parties do not dispute that Georgia is the place where the alleged acts or omissions occurred. *See Howell v. United States*, 932 F.2d 915, 917 (11th Cir. 1991).

**1. False Arrest and False Imprisonment**

The Plaintiff claims she was falsely arrested when she was taken into ICE custody on April 27, 2011 and, again, seven days later when she says she should have been released. (Doc. 14 at 3). She claims she was falsely imprisoned until she was ultimately released in February 2012. The Government argues that the Court lacks subject matter jurisdiction over these claims. (Doc. 37-1 at 13-16).

"Federal courts lack subject-matter jurisdiction over 'any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.'" *Gupta v. McGahey*, 709 F.3d 1062, 1065 (11th Cir. 2013) (quoting 8 U.S.C. § 1252(g)). "The Supreme Court has interpreted § 1252(g) to foreclose judicial review for three discrete actions of the Attorney General: his 'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders.'" *De La Teja v. United States*, 321 F.3d 1357, 1365 (11th Cir. 2003) (internal quotation marks and citation omitted). Thus, § 1252(g) does not apply to other decisions or actions that "may be taken before, during, and after removal proceedings—'such as the decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order.'" *Alvarez v. U.S. Immigration & Customs Enf't*, --- F.3d ---, 2016 WL 1161445, at *6 (11th Cir. 2016) (citation omitted).

The Government argues the Plaintiff cannot challenge "ICE's *decision* to take her into custody in order to proceed with removal proceedings on April 27, 2011," nor can she challenge "ICE's *actions* of taking her into custody and the resulting detention her [sic] during her removal proceedings." (Doc. 37-1 at 14-15). The Court agrees. "By its

-15-

plain terms," § 1252(g) bars federal courts "from questioning ICE's discretionary decisions to commence removal." *Alvarez*, --- F.3d at ---. ICE's decisions to take the Plaintiff into custody and to detain her during her removal proceedings were closely connected to the decision to commence removal proceedings. *See id.*; *Gupta*, 709 F.3d at 1065 ("Securing an alien while awaiting a removal determination constitutes an action taken to commence proceedings."). Therefore, the Plaintiff's claims that she was falsely arrested when she was transferred into ICE custody and falsely imprisoned until she was released "challenge[] the actions the agents took to commence removal proceedings—exactly the claims that § 1252(g) bars from the subject-matter jurisdiction of federal courts." *Gupta*, 709 F.3d at 1065. Accordingly, the Court lacks subject matter jurisdiction over these claims,[11] and they are **DISMISSED**.[12]

## 2. Assault

Under Georgia law, "an assault occurs when all the apparent circumstances, reasonably viewed, are such as to lead a person reasonably to apprehend a violent injury from the unlawful act of another." *Bullock v. Jeon*, 226 Ga. App. 875, 878, 487

---

[11] Even if the Court had jurisdiction over these claims, it is clear that they fail under Georgia law. There is no evidence that the Plaintiff was taken into custody maliciously and without probable cause or that her detention was unlawful. *See Smith v. Wal-Mart Stores E., LP*, 330 Ga. App. 340, 343, 765 S.E.2d 518, 521 (2014). On the contrary, it is undisputed that the Plaintiff had long overstayed her visa and was taken into ICE custody only after she had been jailed for criminal offenses.

[12] In the context of these claims, the Plaintiff argues that there was no Notice to Appear and even if there were, it was not "binding," "legal," "proper," "timely served," or received by her. (Docs. 98 at 2-5; 113 at 4-9). The Government asserts in its statement of material facts that the Plaintiff was served with a Notice to Appear while residing in Honolulu, Hawaii. (Doc. 38 at ¶ 4). In support, the Government has filed the Notice to Appear, which contains a certificate of service that says it was served on the Plaintiff on August 27, 2007 by certified mail. (Docs. 11-2 at 2; 38 at ¶ 4). Without citing to any evidence, the Plaintiff responds that "[n]o Notice was served" and "[a]gain no NTA was served so stop repeating this falsehood." (Docs. 47 at ¶ 4; 113-1 at ¶ 4). Because the Plaintiff failed to properly address the Government's assertion of fact, the Court considers it undisputed for purposes of the motion. M.D. Ga. L.R. 56; Fed. R. Civ. P. 56(e). The Court also notes that in her initial complaint, the Plaintiff alleged that "[o]n or around May 10, 2011 Homeland Security issued another illegal Notice to Appear in plaintiff's Immigration Case." (Doc. 1 at ¶ 11); *see also Bloodworth*, No. 5:13-cv-112, ECF No. 66 at 44:19-45:2, 180:10-15 (transcript of the Plaintiff's various immigration proceedings, confirming receipt of a Notice to Appear).

S.E.2d 692, 696 (1997) (citation omitted); *see also Wallace v. Stringer*, 250 Ga. App. 850, 853, 553 S.E.2d 166, 169 (2001). Even after construing the evidence in the light most favorable to the Plaintiff, the Plaintiff has failed to show that Settle's actions and statements "would create such an apprehension of violent injury as reasonably to be considered an assault." *Hallford v. Kelley*, 184 Ga. App. 90, 92, 360 S.E.2d 644, 646 (1987). "A reasonable person in the circumstances presented would not have apprehended violent injury." *Bullock*, 226 Ga. App. at 878, 487 S.E.2d at 696.

In her amended complaint, the Plaintiff also claims she was assaulted on or around October 15, 2011, when ICE agents sought to intervene in a fight between "two Spanish females" and "pushed the plaintiff against the brick wall" even though she was "20 feet from the altercation and in no way … involved in the incident." (Doc. 14 at 6). Because the Plaintiff did not include this allegation in her administrative claim, the Court lacks jurisdiction to consider an assault claim based upon it. *See, e.g.*, *Tidd v. United States*, 786 F.2d 1565, 1568 (11th Cir. 1986). Even if this claim were not barred, it too would fail as a matter of law. Not only does the Plaintiff fail to cite to any evidence regarding this purported assault, but her testimony establishes there was no assault: She *was* involved in the incident, she tried to talk to an ICE agent about it, and the agent simply "wouldn't listen and kind of pushed [her] against the wall." (Docs. 38 at ¶¶ 35-37; 39-2 at 27:15-28:24, 30:1-31:7; 98 at 13; 113 at 16-17).

### 3. Intentional and Negligent Infliction of Emotional Distress

To sustain a claim for intentional infliction of emotional distress, the Plaintiff must show "(1) intentional or reckless conduct; (2) that is extreme and outrageous; (3) a causal connection between the wrongful conduct and the emotional distress; and (4)

severe emotional distress." *Renton v. Watson*, 319 Ga. App. 896, 903, 739 S.E.2d 19, 26 (2013).  The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*  Moreover, "whether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law." *Miraliakbari v. Pennicooke*, 254 Ga. App. 156, 157, 561 S.E.2d 483, 486 (2002).  "If the evidence shows that reasonable persons might find the presence of extreme and outrageous conduct and resultingly severe emotional distress, the jury then must find the facts and make its own determination." *Yarbray v. S. Bell Tel. & Tel. Co.*, 261 Ga. 703, 706, 409 S.E.2d 835, 838 (1991).  Finally, a "claim for emotional distress inflicted by negligent conduct is allowed only where there is some physical injury to the claimant." *Wellborn v. DeKalb Cty. Sch. Dist.*, 227 Ga. App. 377, 378-79, 489 S.E.2d 345, 347 (1997); *see also Kirkland v. Earth Fare, Inc.*, 289 Ga. App. 819, 821-22, 658 S.E.2d 433, 436 (2008) (listing the requirements of the Georgia impact rule); *Canberg v. City of Toccoa*, 255 Ga. App. 890, 891, 567 S.E.2d 21, 23 (2002) (same).

*Miraliakbari* is illustrative of the requisite level of outrageousness and egregiousness necessary to sustain a claim for intentional infliction of emotional distress.  There, a single mother whose six-year-old son was injured at school was told by an acquaintance that she needed to go to school because "something has happened to your son." *Id.* at 158, 561 S.E.2d at 486.  Her supervisor refused to let her leave and told her she would be fired if she did.  The acquaintance offered to pick up the boy, and the mother gave him the relevant information.  After realizing she had given the

acquaintance an incorrect telephone number, she asked her supervisor if she could use the business phone.  Despite hearing that her son had an accident at school, the supervisor refused, unplugged the phone when the mother attempted to use it anyway, and told her she would be fired if she touched the phone again.  Although the supervisor's behavior was "reckless and possibly wanton," the Georgia Court of Appeals held that it was not "of such serious import as to naturally give rise to such intense feelings of humiliation, embarrassment, fright or extreme outrage as to cause severe emotional distress."  *Id.* at 159, 561 S.E.2d at 487 (citation omitted).  In addition, there was "no evidence of malice, intent to harm, or retribution."  *Id.* at 160, 561 S.E.2d at 488.

The Plaintiff argues that Arabi, Jones, and Skinner refused to provide her with medical treatment.[13]  (Docs. 39-1 at 108:24-109:1; 98 at 7-8; 113 at 13).  She also argues the "cumulative and repeated actions" of ICE, including the conditions of her trips to the immigration court, her false arrest and imprisonment, the assault, and the denial of medical attention, support her intentional infliction of emotional distress claim.  (Docs. 98 at 9-12; 113 at 14-15).  The conduct the Plaintiff complains about, which is discussed in detail in Section I, does not rise to the level of egregiousness necessary to sustain a claim for intentional infliction of emotional distress under Georgia law.  *See Miraliakbari*, 254 Ga. App. at 157-60, 561 S.E.2d at 486-88; *Jones v. Muskegon Cty.*, 625 F.3d 935, 948 (6th Cir. 2010).  Moreover, the Plaintiff cannot prevail on her claim

---

[13] The Government argues that any claim related to improper medical treatment fails under the independent contractor exception to the FTCA.  (Doc. 37-1 at 16-17); *see* 28 U.S.C. § 2671 (excluding "any contractor with the United States"); *Tisdale v. United States*, 62 F.3d 1367, 1371 (11th Cir. 1995) ("Thus, the United States is not liable for the acts or omissions of the independent contractors that it employs.").  Of course, this exception "does not shield the government from liability for the government's own negligent acts."  *Berrien v. United States*, 711 F.3d 654, 659 (6th Cir. 2013).  According to the evidence presented by the Plaintiff, which the Government fails to address, ICE agents were responsible for and made the decisions to withhold the Plaintiff's medical treatment.

for negligent infliction of emotional distress because it is undisputed that she did not suffer a physical impact.  *See Kirkland*, 289 Ga. App. at 821-22, 658 S.E.2d at 436.

Accordingly, the Government's motion for summary judgment (Doc. 37) is **GRANTED**, and the Plaintiff's motion for summary judgment (Doc. 98) is **DENIED**.

### C. The Plaintiff's remaining motions

The Plaintiff's motions to strike her deposition testimony (Docs. 44; 55) are **DENIED**.  The Court did not "assure[] the husband and plaintiff that those questions and answers in the upcoming deposition would not be admissible in this case."  (Doc. 44 at 1).  *See* (Doc. 62) (transcript of the December 20, 2013 hearing).  The Plaintiff's second motion to amend her administrative claim (Doc. 48) is **DENIED** as moot and futile because her claims fail as a matter of law.  The Plaintiff's motion to compel a transcript (Doc. 53) is **DENIED** because she is not excused from paying for it and it is also moot.  *See* (Doc. 62).  The Plaintiff's motion to compel discovery (Doc. 58) is **DENIED** because the Government responded to her discovery requests.  *See* (Doc. 42).  The Plaintiff's motion to recast (Doc. 84) is **DENIED**.  Finally, the Plaintiff's motions for a hearing (Docs. 83; 116) and for arbitration (Doc. 94) are **DENIED** as moot.

### III.   CONCLUSION

The Government's motion for summary judgment (Doc. 37) is **GRANTED**, and the Plaintiff's motions (Docs. 44; 48; 53; 55; 58; 83; 84; 94; 98; 116) are **DENIED**.

**SO ORDERED**, this 21st day of April, 2016.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT
